**In the Matter of CONTINENTAL AIRLINES, INC., et al., Debtors.**

**Bankruptcy Nos. 90–932 through 90–984.**

United States Bankruptcy Court, D. Delaware.

Aug. 27, 1992.

See also 146 B.R. 520.

Richard G. Elliott, Jr., Emily Horton, Richards, Layton & Finger, Wilmington, Del., Warren J. Martin, Jr., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for First Fidelity Bank Nat. Ass'n New Jersey, as collateral Trustee.

Stephen E. Herrmann, Todd V. Jones, Richards, Layton & Finger, Wilmington, Del., for Wilmington Trust Co., as Trustee.

Leo T. Crowley, Glenn E. Siegel, Winthrop, Stimson, Putnam & Roberts, New York City, for The Bank of New York, as Trustee.

T. Jay Thompson, Continental Airlines, Inc., Zack A. Clement, Joe Nistico, Fulbright & Jaworski, Houston, Tex., Laura Davis Jones, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for debtors.

James E. Brandt, Michael K. Hertz, Latham & Watkins, New York City, Peter J. Walsh, Bayard, Handelman & Murdoch, Wilmington, Del., for the Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Wilmington Trust Company (WTC), The Bank of New York (BNY) and First Fidelity Bank (FFB) (collectively Movants) have filed motions for adequate protection of their interest in aircraft collateral and related equipment and engines held by debtor-in-possession Continental Airlines, Inc. Movants all assert that they were fully secured as of the petition date but that the collateral has dropped precipitously in value post-petition, entitling them to adequate protection payments. The Debtor and the Official Committee of Unsecured Creditors oppose the motions primarily on the grounds that all depreciation occurred pre-petition and values have remained constant post-filing. For the reasons that follow, the court holds that Movants are not entitled to adequate protection.

## I. FACTS

### A. *The Bank of New York*

The Bank of New York is Trustee under a Secured Equipment Indenture and Lease Agreement, dated April 15, 1984, between BNY and People Express Airlines, Inc. (Continental is successor in interest to People Express). Under the Agreement, BNY took a security interest in twelve Boeing 727–200 advanced series airframes and twelve Pratt & Whitney JT8D–9A engines. Secured Equipment Certificates were issued in the principal amount of $66,400,000

to the public. As of the petition date, $67,529,034.67 remained outstanding under the Indenture and Lease Agreement.

### B. *Wilmington Trust Company*

Wilmington Trust Company is Trustee under a Secured Equipment Indenture and Lease Agreement, dated April 15, 1986, entered into with People Express Airlines, Inc. Under the Agreement, the Trustee was to purchase seven Boeing 727–200 and fourteen Boeing 737–100 airframes and accompanying engines from People Express and issue Secured Equipment Certificates in the amount of $115,000,000. As of the petition date the total amount due in principal and interest was approximately $115,-000,000.

### C. *First Fidelity Bank*

First Fidelity Bank is the Collateral Trustee under a Secured Equipment Indenture and Lease Agreement, dated March 15, 1987, entered into with Continental. Under the agreement, First (10%), Second (11%) and Third (11⅜%) Priority Secured Equipment Certificates were issued to the public in the amount of $350,000,000. (There is a Series Trustee for each series joined in FFB's motion; each of whom must authorize the Collateral Trustee's actions.) Continental granted FFB a security interest in 29 aircraft and 73 spare engines and was to make bi-annual principal and interest payments. As of the petition date, the outstanding debt was $180,047,000.

### D. *Bankruptcy*

Continental filed bankruptcy in this court under Chapter 11 on December 3, 1990. None of the post-petition obligations under the three Indentures and Leases have been met. On February 21, 1991 Wilmington Trust, First Fidelity and The Bank of New York, among many others, filed the Omnibus Motion for Order Compelling Payment of Administrative Rent, Granting Adequate Protection and Fixing Time for Assumption or Rejection of Unexpired Leases. First Fidelity subsequently withdrew as an Omnibus Movant, filing instead the Joint Motion of Collateral Trustee and First, Second and Third Priority Secured Equipment Trust Certificates Trustees Under $350 Million Secured Equipment Indenture for Adequate Protection on June 28, 1991. The motions were joined for trial.

Prior to trial, The Bank of New York stipulated to the fact that the Equipment Trust transaction was a secured financing arrangement rather than a lease. As a result, BNY amended its original prayer for relief to seek adequate protection only, dropping the request for administrative rent.

First Fidelity stipulated to the fact that its Indenture is a financing arrangement for the purpose of its adequate protection motion alone while reserving its right to try the "true lease" issue at a later date. Finally, Wilmington Trust refused to stipulate to the fact that its Indenture was a financing arrangement but the court ruled at the hearing that it would be treated as such for purposes of the adequate protection motion.

The valuation hearing bifurcated market value decline into two factors: decline due to market conditions and decline due to Continental's post-petition use and lack of maintenance of the collateral. The court heard only the former issue. The Bank of New York and Continental have since entered into a stipulation regarding post-petition use and maintenance. This issue remains to be resolved only as to First Fidelity and Wilmington Trust.

## II. LAW

Movants assert that they are entitled to adequate protection payments as a result of the collateral's post-petition decline in market value. 11 U.S.C. §§ 361(1) & 363(e). The Debtor responds that Movants are not entitled to adequate protection payments because factually all the decline in value occurred pre-petition. In the alternative, if there has been a decline in value post-petition Movants are only entitled to compensation for the decline subsequent to the Omnibus Motion date. Finally, Continental claims these Movants should receive nothing because they have not sought relief from stay as an alternative to the re-

quested adequate protection payments. *In re Glinz,* 69 B.R. 916, 920 (Bankr.D.N.D. 1987). Movants respond that this last argument is first plain wrong and second that their motion seeking section 1110 protection, filed simultaneously with the adequate protection motion, is the equivalent of a lift stay motion.

Continental "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). One of the limitations on this right is contained in section 363(e):

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased ... the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

The Debtor has the burden of proof on adequate protection. 11 U.S.C. § 363(*o*)(1).

Section 361 defines adequate protection as it is used in the code:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of the title ... results in a decrease in the value of such entity's interest in such property[.]

The Supreme Court has drawn a distinction between oversecured and undersecured creditors seeking adequate protection. In *United States Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.,* the Supreme Court affirmed the Fifth Circuit's denial of post-petition interest to an undersecured creditor during the pendency of the stay. 484 U.S. 365, 382, 108 S.Ct. 626, 636, 98 L.Ed.2d 740 (1988). In so doing the Supreme Court held that undersecured creditors are not entitled to compensation for the delay in foreclosure attributable to the automatic stay. In dicta, the court opined that an undersecured creditor whose collateral was decreasing in value would be entitled to adequate protection payments. *Id.* at 370, 108 S.Ct. at 629.

Post–*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral. *See, e.g., In re Forest Ridge II, Ltd.,* 116 B.R. 937, 950 (Bankr.W.D.N.C.1990) (undersecured creditor not entitled to adequate protection where real property collateral not declining in value). If the creditor is oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1). *See, e.g., In re Senior Care Properties,* 137 B.R. 527, 529 (Bankr.N.D.Fla.1992); *In re Lane,* 108 B.R. 6, 8 (Bankr.D.Mass. 1989).

A question left open in *Timbers,* and on which bankruptcy courts are split, is from what point in time are secured creditors owed adequate protection. (This issue is often presented as what is the appropriate valuation date for the collateral subject to the adequate protection motion: the petition date, motion date, confirmation or some other date.)

Movants claim they are entitled to adequate protection payments to compensate for any decline in value of the collateral post-petition. *In re Monroe Park, Ltd. (Metropolitan Life Ins. Co. v. Monroe Park, Ltd.),* 17 B.R. 934 (D.Del.1982). Continental argues that movants may only seek adequate protection for the period after they have sought relief from the court. *In re Haiflich,* 63 B.R. 314, 316 (Bankr. N.D.Ind.1986).

The court agrees with the Debtor that in the absence of controlling precedent the better view is that adequate protection may only be awarded from the date movants seek relief. *In re Best Products Co., Inc.* 138 B.R. 155 (Bankr.S.D.N.Y.1992). In *Best Products* Chief Judge Lifland held that the motion date is the appropriate valuation date for collateral subject to the automatic stay. The secured creditor could only receive adequate protection to the extent the collateral declined in value after it filed its motion for adequate protection, rather than receiving compensation for all post-petition decline in value. *Id.* at 157.

In so ruling, Chief Judge Lifland relied on three main factors. First the language of section 363(e) provides that the court shall provide adequate protection "on request," implying that the onus is on the creditor to so move. *Id.* Second, the possible hardship to the debtor if a creditor waited until late in the bankruptcy proceedings to file its motion, subjecting the debtor to "sizeable 'makeup' payments." *Id.* (*quoting Ahlers v. Norwest Bank*, 794 F.2d 388, 395 n. 6 (8th Cir.1986) *rev'd on other grounds, Norwest Bank v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)). Finally, the adequate protection motion puts the debtor on notice that it "must decide what it should do with collateral. The debtor is given the option to surrender the property to the entity that has made the request, and avoid providing adequate protection, or provide adequate protection to such entity for the debtor's continued use of the collateral." *Id.* at 158.

There is a related approach, thoroughly discussed in *Ahlers* and still in use. Adequate protection is due only from the time "the creditor could have obtained possession and disposed of the property" but for the automatic stay. *In re Glinz*, 69 B.R. 916, 920 (Bankr.D.N.D.1987) (applying *Ahlers*). Accordingly, the collateral must be valued as of the date the secured creditor could sell it, which may not be the same date the creditor moved for adequate protection or relief from stay. *Ahlers v. Norwest Bank*, 794 F.2d at 397–98; *accord, In re Deico Elecs., Inc. (Paccom Leasing Corp. v. Deico Elecs., Inc.)* 139 B.R. 945, 947 (9th Cir. BAP 1992) ("[A]dequate protection analysis requires the bankruptcy court to first determine when the creditor would have obtained its state law remedies had bankruptcy not intervened.") (not citing *Ahlers*).

█ Luckily the difference between these two views, if any (after all *Best Products* dealt with data processing equipment subject to immediate foreclosure rather than real estate), need not be resolved by this court. The collateral at issue is all aircraft and related equipment. If relief had been granted when the adequate pro-

tection or section 1110 motions were brought, the collateral would have been available almost immediately for sale. Therefore the appropriate date for valuation is the date the adequate protection motion was filed.

*In re Monroe Park* does not mandate a different result. (*Metropolitan Life Ins. Co. v. Monroe Park*), 17 B.R. 934 (D.Del. 1982). In *Monroe Park* the District Court affirmed this court's granting of relief from stay on the grounds that the undersecured mortgagee's interest in an apartment building was inadequately protected due to accruing post-petition interest. *Id.* at 936. At the time the debtor-mortgagor filed bankruptcy, the mortgagee had already commenced foreclosure proceedings in Superior Court. The bankruptcy court's findings of fact and valuation dates were not disputed on appeal, so that issue was not before the District Court. *Id.* at 938. There is a statement that the secured creditor was entitled to adequate protection "for the interim period between filing of the petition and confirmation." *Id.* at 940. On the *Monroe Park* facts, that is not true after *Timbers:* an undersecured creditor whose collateral is not decreasing in value is not entitled to compensation for the delay in foreclosure (interest) due to the automatic stay. No doubt *Monroe Park* would have been decided differently today.

█ Finally, the court does not agree that adequate protection may only be sought in conjunction with a lift stay motion. While typically they are brought as alternatives, there is no such explicit requirement in the Code. In fact, the existence of section 363(e) would imply that adequate protection may be sought independently.

### III. TESTIMONY AT TRIAL

Three valuation experts testified at the hearing. Continental presented the testimony of John Luth, its Vice President of Finance and Treasurer. First Fidelity and The Bank of New York both presented the testimony of Richard Wells, a certified aircraft appraiser for Avitas Aviation. Wilmington Trust relied on the testimony of

Clive Medland of Simat, Helliesen & Eichner. Both Avitas and Simat Helliesen are companies in the business of appraising aircraft.

Luth testified first. The thrust of his testimony was that the aircraft market collapsed in the Fall of 1990 for a number of reasons and remained relatively static for the next twelve months. He spoke generally on national and international events which contributed to this decline, and he supported his analysis of the Stage 2 aircraft market with Avitas Blue Book values. (Most of the equipment in the collateral pool are Stage 2 aircraft.) Finally, he presented his valuations of the individual aircraft and engines prepared for Continental the first week of March 1991.

Luth attributed the collapse in the Stage 2 aircraft market to three major factors. First, the Iraqi invasion of Kuwait in August of 1990, which triggered increased fuel prices and decreased American tourism abroad. Second, the recession which had at least begun by the Summer of 1990 and contributed to decreased air travel. Third, the Stage 2 noise regulations, which were known to the industry as early as 1988 and saw actual enactment in October of 1990. 49 U.S.C.A. app. § 2157 (1991). This legislation called for the gradual phase-out of noisy Stage 2 aircraft by the year 2000. 56 Fed.Reg. 48628, 48659–60 (1991).

Luth supported his conclusions with the Avitas Blue Book values for Stage 2 aircraft. These guides are published twice a year in July and January, based on market data gathered the few months prior to publication. Therefore, the published values lag the market by two to three months. According to the Avitas Blue Books for July 1990 through July 1991, Stage 2 aircraft values generally dropped steadily from July 1990 through January of 1991 and then remained static through July of 1991.

Luth valued the collateral as of March 1990 (the discrete individual values presented at the hearing have been summed). BNY's collateral pool was valued at 49 million dollars, FFB's at 103 million, and WTC's at 52 million. These values were the result of communications with the marketplace by Luth and his staff: evaluations of aircraft comparables, aircraft on the market, and aircraft coming off lease.

Very generally, the opposing experts agreed with Mr. Luth on the primary factors affecting the aircraft market, although in most instances they disagreed on the timing of the effect: whether it was sharp and immediate or gradual and delayed. For example, the new noise legislation which Luth saw as promoting a sharp drop in Stage 2 aircraft values immediately post-passage was seen as promoting a gradual decline in Stage 2 aircraft values by Wells because the older aircraft could be phased out over a period of ten years.

Mr. Wells testified that the aircraft had indeed been losing value prior to the petition date but that the decline continued post-petition. Wells valued BNY's collateral pool at 76.3 million as of the petition date and 57.8 as of the trial date: a loss of 18.5 million in nine months. Wells valued FFB's collateral pool at 194 million as of the petition date and 161 million in late August, a decline of 33 million in nine months.

Wells based his valuations on a combination of variously weighted factors: the Avitas Blue Books, analysis of the marketplace and comparables. It was elicited on cross examination that Wells' petition date valuations were identical to an average of the Blue Book values for January 1991 and July 1990, although he testified that he considered other factors rather than simply taking an average of the two Blue Book values.

Mr. Medland testified that the Stage 2 aircraft in WTC's collateral pool were worth approximately 82 million as of the petition date and 50 million eight months later: a loss of nearly 32 million dollars post petition. Medland's starting point for the valuation was a comparable from March 1990—eight months prior to the filing date. Medland reasoned that the December 1990 aircraft values had not declined greatly over the summer and that the March values held steady through the

rest of 1990. Given the world events between March and December of 1990, the court finds this conclusion unrealistic and this transaction unreliable as a comparable. By way of comparison, the July 1990 Avitas blue book values for 727–200 advanced aircraft are in the seven to eight million range, but drop by two or three million dollars by the next issue (January 1991).

■ In summary, the expert conclusions as to the collateral pool values varied widely. All three experts were credible, although it was obvious in each instance who they represented. Given the unresolvable conflict in values (and because it is impossible to absolutely discount any one expert's testimony), the court finds that the Blue Books are the most reliable in charting general market values for the period July 1990 through July 1991. (The Blue Book values for a particular model of aircraft were usually at least one million dollars more than the values assigned by Luth and three to four millions of dollars less than the values assigned by Wells and Medland.)

■ As mentioned, the Blue Books indicate a general decline in value from July 1990 through January 1991. At that point, the market values bottomed out and remained constant through July 1991. While the Blue Book aircraft values are higher than those ascribed by Luth, they still indicate that the Trustees were undersecured as of the Omnibus motion date (and most likely as of the December 1990 filing date because the Blue Book values lag the market place by several months). The Trustees are only entitled to adequate protection if their collateral declined in value after the adequate protection motion was filed. Therefore, the court need only determine if the collateral has actually decreased in value since the motion date. The court finds that the aircraft values have remained flat post January 1991, as indicated by the July 1991 Blue Book values. Therefore, Movants are not entitled to adequate protection based on decline in market value due to market conditions.

## IV. CONCLUSION

An Order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, August 27, 1992, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED that the request of The Bank of New York, Wilmington Trust Company and First Fidelity Bank for adequate protection is DENIED.